UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS DALEY,

     Plaintiff,

                                        Case No. 23-cv-11215

v.                                     Hon. Matthew F. Leitman

ADVANCE ENGINEERING CO.,

     Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 11)

In this action, Plaintiff Thomas Daley alleges that his employer, Advance Engineering Company ("AEC"), discriminated against him based on his disability in violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.101, *et seq.* (the "PWDCRA") when it (1) failed to accommodate him and (2) terminated him because of his disability. (*See* Compl., ECF No. 1.)  AEC has now moved for summary judgment on Daley's claims. (*See* Mot. for Summ. J., ECF No. 11.)  For the reasons explained below, AEC's motion is **GRANTED**.

**I**

**A**

Daley, a resident and citizen of Ohio, has had "severe hearing loss in both of [his] ears" since age five. (Daley Dep. at 29:1-14, ECF No. 11-2, PageID.106.)

While Daley's hearing loss affects his "ability to hear and follow conversations," through "advances in technology," "assistive devices," and reading lips, he is able to work as a coordinate measuring machine operator and programmer (a "CMM Operator"). (*Id.* at 29:4-11, 63:5-13, PageID.106, 140.)

AEC is a Michigan corporation founded in 1922. (*See* AEC Employee Handbook Cover Letter, ECF No. 11-3, PageID.186.)  It operates a stamping facility in Beaverton, Michigan that specializes in precision deep drawn and progressive die stampings and plastics thermal forming. (*See id.*)

Despite Daley's hearing loss, AEC twice hired him to work as a CMM Operator.  He first worked in that position for AEC from 2011 through 2015. (*See* Daley Dep. at 29:22-30:2, PageID.106-107.) He voluntarily left AEC in 2015 to pursue a CMM engineer position at another company. (*See id.* at 30:1-12, PageID.107.)  He does not allege that AEC discriminated against him during his first term of employment with the company. (*See id.* at 36:15-18, PageID.113.)

AEC rehired Daley as a CMM Operator in 2017. (*See id.* at 19:25-20:2, 27:20-24, PageID.96-97, 104.)   At that time, AEC was aware of Daley's hearing limitations. (*See id.* at 38:12-25, PageID.115.)

In his role as a CMM Operator, Daley operated and programmed a "robotic machine for measuring automotive parts" that AEC made. (*Id.* at 28:1-2, PageID.105.)  His assigned tasks included "inspect[ing] initial production parts,"

"inspect[ing] and certify[ying] prototype, trial layouts, dedicated production fixtures, and perform[ing] basic layouts," and performing "analysis on variable data instruments." (Job Description – CMM Operator, ECF No. 11-4, PageID.188.) To perform these tasks, Daley was required to "primarily work[] in the production and warehouse areas" of AEC's stamping facility. (*Id.*, PageID.189.) Between March and June of 2020 – the time of AEC's alleged discrimination– Daley was AEC's only CMM Operator. (*See* Daley Dep. at 49:6-16, ECF No. 11-2, PageID.126.)

## B

While Daley was employed at AEC, AEC maintained a policy aimed at making it "possible for an individual with a disability to enjoy an equal employment opportunity" (the "ADA Policy"). (ADA Policy, ECF No. 11-5, PageID.192.) Under the ADA Policy, AEC committed to "mak[ing] every reasonable effort, consistent with business needs, to accommodate associates with medical disabilities[.]" (*Id.*) The ADA Policy further provided that it is an employee's "responsibility to request a reasonable accommodation," and the policy informed employees that AEC may request information from their physicians in order to help identify reasonable and appropriate accommodations. (*Id.*)

During Daley's employment, AEC also maintained a policy regarding its employees' attendance (the "Attendance Policy"). (*See* Attendance Policy, ECF No. 11-6, PageID.194.) The Attendance Policy provided as follows:

Regular attendance and punctuality are part of your job responsibility. You are expected to arrive on time, ready to work, every day; maintain good personal health standards which will allow you to perform your work in a competent manner on a regular basis; avoid letting minor indispositions keep you from performing your job; and attend to personal affairs during non-working hours.

When you are unable to arrive on time or must be absent for an entire day, you must notify the Company by calling our "Attendance and Information Hotline" as far in advance as possible and before the start of your shift. Leaving a message with a coworker or having someone else report your absence for you is not acceptable except in the case of a true emergency that may prevent you from reporting your absence directly.

*** 

Absenteeism and tardiness interfere with your contributions and those of your fellow associates and will result in discipline that may include separation of employment. Failure to notify your supervisor when you will be absent or tardy will also result in discipline that may include separation of employment.

*** 

Failure to call in or report for work for two (2) days, will be considered as a voluntary resignation/job abandonment.

(*Id.*, PageID.194-195.)

## C

Around March 23, 2020, due to the COVID-19 pandemic, AEC partially shut down its operations and temporarily laid off several employees, including Daley.

4

(*See* Daley Dep. at 49:22-50:19, ECF No. 11-2, PageID.126-127.)  At that time, AEC told Daley that his anticipated return to work date would be April 6, 2020. (*See id.*)

On April 6, 2020, Daley did not return to work. (*See id.* at 50:20-23, PageID.127.)  Instead, on April 7, 2020, Daley emailed Dean Corra, a vice president of AEC, to "share [his] concerns" about returning to work. (*Id.* at 51:6-13, PageID.129; 04/27/2020 Daley Email, ECF No. 11-7, PageID.197.)  Daley told Corra that "communication will become nearly impossible for [him] if people are wearing masks." (04/27/2020 Daley Email, ECF No. 11-7, PageID.197.)  Daley added that "the risk of getting infected, despite good precautions being taken, is large enough to take to heart." (*Id.*)  He ended his email by telling Corra that "the risk of infection is high enough that I should wait until later [to return to work]." (*Id.*, PageID.198)

Corra forwarded Daley's email to Monica Entsminger, who performed human resources work for AEC (*see* Dep. of Monica Entsminger at 7:10-24, ECF No. 11-15, PageID.241), and she responded the same day. (*See* 04/07/2020 Entsminger Email, ECF No. 11-8, PageID.200.)  Entsminger first reminded Daley that "due to [his] job function, [he was] unable to work from home." (*Id.*)  Nonetheless, Entsminger agreed to extend Daley's layoff for an additional period – until May 4, 2020. (*See id.*)  She also shared with Daley "information related to unemployment" that would assist him in qualifying for unemployment benefits during his layoff. (*Id.*)

5

Daley replied that he "appreciate[d] the allowance to stay home" and was gathering information from his "audiologist, primary care physician and also an occupational counselor" to help him "understand any risks" and "learn[] how to communicate" while people are wearing face masks. (04/08/2020 Emails, ECF No. 11-9, PageID.206.)   Entsminger responded that AEC "understand[s] [Daley's] abilities and risks" and "want[s] him to be safe and healthy." (*Id.*, PageID.205.)  She also noted that "[a]ny information you can provide from your doctors and counselor would be great information for us to keep on file." (*Id.*)  Daley then told Entsminger that he would be "sending along information to [her] as [he receives] it." (04/09/2020 Email, ECF No. 11-9, PageID.205.)

On May 4, 2020, Daley's second expected return date, he again did not return to work, nor did he communicate any updates regarding his plans to return to AEC. (*See* Daley Dep. 65:12-14, ECF No. 11-2, PageID.142.)   On May 7, 2020, Entsminger emailed Daley and advised him that his "back to work date" would now be May 11, 2020. (05/07/2020 Emails, ECF No. 11-9, PageID.204.)  Entsminger included with her email to Daley a bullet-point list of safety precautions AEC had implemented to minimize the risk of COVID-19 in its facility. (*See id.*)  Those precautions included issuing masks to employees before they entered AEC's building, placing markings on the floor to ensure social distancing, providing face

shields, screening employees for COVID-19 infections, and modified break and lunch schedules. (*See id.*)

In response, Daley informed Entsminger that his mother was "in her last hours or so, and any resulting family matters, visitation/funeral or such could interfere with [his] return to work." (*Id.*, PageID.203.)  He also stated that he had "maintained strict avoidance of others who possibly have exposure to the new coronavirus and other disease," and he expressed concerns about communicating through face masks given that he relies in part on lip-reading. (*Id.*)

The following day, May 8, 2020, Tim Fradette, a quality manager at AEC, emailed Daley.  Fradette told Daley that he (Fradette) was "[v]ery sorry to hear about the current state of [Daley's] mother" and that Daley's "current arrival time" on May 11 was scheduled for 6:30 a.m. (05/08/2020 Email, ECF No. 11-9, PageID.202.) Fradette asked that Daley "keep [AEC] up to date . . . on what is happening," and he told Daley that "[s]hould current conditions change or deteriorate, [AEC] will support and work with [Daley] the best way possible." (*Id.*)

On May 11, Daley again did not report to work. (Daley Dep. at 69:10-12, ECF No. 11-2, PageID.146.)  Instead, at 8:15 a.m. (one hour and 45 minutes after his scheduled arrival time) Daley emailed Fradette, Corra, and Entsminger to share that his mother was "still with us" and he would "update as [he knows] the situation."

(05/11/2020 Email, ECF No. 11-9, PageID.202.)  He did not mention anything about

returning to work. (*See id.*)  That same day, Corra responded:

> As of last week you were officially notified to return to
> work effective 5/11/20. You are no longer eligible to
> collect unemployment insurance and are required to return
> to work.
>
> Your current work schedule has been modified for this
> week and most likely the following week. You will be
> required to work Monday to Thursday 10 hours shifts.
>
> It is my understanding you have additional PTO left for
> the year. If you require additional time off, we will allow
> you to take the time you have remaining, with the
> understanding you will remain employed at Advance
> Engineering. If anything changes with your mother[']s
> condition that entitles you to 3 days bereavement please
> contact us immediately.

(05/11/2020 Email, ECF No. 11-10, PageID.209.)

By May 26, 2020, Daley still had not returned to work at AEC and had not

communicated any plans to do so. (*See* Daley Dep. at 72:1-13, ECF No. 11-2,

PageID.149.)  One day later, Corra emailed Daley to inquire: "Tom, will you be

returning back to work?" (05/27/2020 Email, ECF No. 11-11, PageID.211.)  Daley

responded that "[d]ue to the passing of my mother this week, we will be burying her

tomorrow." (05/28/2020 Email, ECF No. 11-11, PageID.211.)  He further said "I

continue to maintain my health for my employment, per my doctor's orders (see the

statement I sent some time back) and the reality of my disability. If you have any

responses to my information and questions provided earlier, that will be welcomed."
(*Id.*)  Daley did not say that he would be returning to work. (*See id.*)

On June 1, 2020, Daley emailed Entsminger and complained that Corra's email on May 27 was "abusive." (06/01/2020 Email, ECF No. 11-12, PageID.215.) He then seemed to suggest that his doctor had excused him from returning to work for the time being:

> I possibly will return to work, if conditions permit, among other things. Again, it is my understanding that AEC has a policy of allowing staff to be away if a doctor states such is proper – and on that basis, among others, it seems best that I keep myself safe for further work. My doctor is aware of the level of my disability, or so it seems. My trust in AEC is quickly being eroded.

(*Id.*)

Entsminger responded that AEC expected Daley to return to work, and she identified steps that AEC would take in order to help him safely perform his work:

> I don't think your emails have conveyed in a clear manner what your plan is with returning to work. We understand that you provided a doctor's note from 4/8 stating that you should be away from work until the use of face masks is no longer required. As it is now June, this recommendation most likely won't be lifted until there is a cure for COVID.
>
> The Ohio order has been completely lifted, the Michigan order is to be lifted next week, and all manufacturing has resumed. This includes us, and has always included us, as an essential business. With bringing back all of our laid-off workforce, we have followed all the CDC guidelines and OSHA recommendations.

>We understand that with your disability, it will be difficult for you to read lips with everyone having a mask on. However, we have established changes around that, with ensuring people communicate with you through writing and email only. We can also require people to wear the face shield when communicating with you directly.
>
>We do need an updated doctor's note. As this COVID situation has been very fluid, and your note is from April 8 (which we received May 11), we need an updated note.
>
>Please let me know if there is anything else that needs to be addressed. If any of your questions have not been answered, please send me those questions so that I can respond to them. We look forward to your return, but we also need to know when that will be.

(*Id.*, PageID.214.)

Daley sent two emails in response. On June 2, he wrote, "I believe that I have said, in one way or another, that I would return to work if able and safe." (06/02/2020 Email, ECF No. 11-12, PageID.213.) He also said that one of his "extreme concern[s] is communicating with those at a distance and/or with facial masking." (*Id.*) He acknowledged that "there could be some solutions [or] workarounds," but he said that "since I have heard of only some minimal ones, I assume that safety is not important." (*Id.*) He ended his email by asking, "Can anyone tell my what my job entails now, if anything different, and so I can consider what adaptations could be done?" (*Id.*) Then, on June 3, he sent a second email further setting forth his concerns about returning to work. (*See* 06/03/2020 Email, ECF No. 11-13,

10

PageID.222-230.)  In that email, he proposed reducing his work schedule, (*See id.*, PageID.228), but he did not propose any other accommodations.

On June 8, 2020, Entsminger responded to Daley's concerns. (*See* 06/08/2020 Email, ECF No. 11-13, PageID.220-222.)  She again identified the precautions that AEC had taken to "prevent the spread of COVID-19," and she noted additional accommodations AEC would implement "[i]n response to [Daley] specifically and [his] disability":

- Ensure that you are communicated with via writing/email. Tim Fradette will be the only one to come in contact with you to retrieve or bring messages from others. All other associates have been notified not to approach you or communicate with you. There will be tape around your work area so that no one can come near you and you are not to be on the plant floor near any other associates.

- We have ordered masks that are clear in the mouth area, meant to enable lip reading, as suggested by the EEOC.

- We will require Tim, who will be in contact with you, to wear the lip-enabled mask or a face-shield if speaking to you, so that you can read his lips. This would be a back-up only, as we do plan to communicate only via writing/email

- Any gages that need to be seen by you will be sanitized so that you can see them being sanitized prior to you obtaining.

(*Id.*, PageID.221.)  Entsminger also informed Daley for a second time that AEC required information from a medical professional:

As stated in my previous email, we do require information from a medical professional. The EEOC has issued substantial guidance on managing employees with disabilities that have concerns about returning to work due to COVID-19. In its guidance, the EEOC has determined that the employer may ask questions or ask for medical documentations to determine whether the employee's disability necessitates accommodation. The EEOC states that it may ask for medical documentation concerning the following:

(1) how the disability creates a limitation,

(2) how the requested accommodation will effectively address the limitation,

(3) whether another form of accommodation could effectively address the issue, and

(4) how a proposed accommodation will enable the employee to continue performing the "essential functions" of his/her position (that is, the fundamental job duties).

We did receive a doctor's note from you on 5/11 (dated 4/8), but due to this very fluid situation, we did ask for an updated note, and per the EEOC, the information should include the above.

We ask that you can provide the above information by June 22, 2020. Failure to have all documentation by that date may result in termination.

\*\*\*

[A]t this point, we are very concerned with if/when you will be coming back to work. We have reiterated the precautions the company has taken to prevent the spread of COVID-19, we have listed the accommodations for your disability, and we have asked for medical

> documentation. If there are more accommodations that you require, we are open to discussing those as well.

(*Id.*, PageID.221-222.)

On June 11, 2020, Daley responded to Entsminger's email. (06/11/2020 Email, ECF No. 11-13, PageID.219-220.)  In his response, he proposed reducing his work schedule from 40 hours per week to 34 hours per week – to "allow [him] to sleep enough" (*see id.*, PageID.219) – but he did not propose any other accommodations.   Instead, he raised concerns about Entsminger's proposed accommodations.  For instance, he worried that clear face masks and face shields would block sound and make hearing even more difficult for him. (*See id.*, PageID.220.) But he did not acknowledge Entsminger's offer to have AEC employees communicate with him in writing.  He further wrote: "If you have questions for my doctor, you have my permission to ask him . . . If you want answers from him, then please provide the information to me so I can give it to him." (*Id.*, PageID.219.)

Entsminger responded on June 17, 2020. (*See* 06/17/2020 Email, ECF No. 11-13, PageID.218-219.)  She stressed that Daley could wear "a mask or face shield of [his] choosing that best suits [him]." (*Id.*, PageID.218.)  She then explained that Daley could not work reduced hours because "[a]n essential function of your job is that you work full shifts in the plant amounting to 40 hours per week." (*Id.*)  She also informed Daley that AEC "cannot speak to your physician.  Instead, we need

13

the medical documentation necessary to support your request for any additional reasonable accommodations that you desire." (*Id.*)  Entsminger again identified the documentation AEC required from Daley's physician, and she requested a note from Daley's physician for a third time. (*See id.*)  Entsminger further reminded Daley that AEC required that medical documentation by June 22, 2020. (*See id.*, PageID.219.)  Finally, Entsminger included a copy of Daley's "essential job functions" that he had signed when he accepted the position at AEC. (*Id.*)  She informed him, "[i]f you are unable to perform these tasks with reasonable accommodations in place, we cannot continue to hold your position." (*Id.*, PageID.219.)

Daley did not send AEC the requested documentation on June 22.  Instead, that day, Daley emailed Entsminger: "I have heard no response yet from my physician, although it could be that he needs time to review the discussions underway." (06/22/2020 Email, ECF No. 11-13, PageID.218.)  Daley did not suggest any timeline on which his doctor might provide the required documentation.  On June 26, 2020, AEC sent Daley a letter notifying him that he was considered to have "voluntarily resigned from [his] position with Advance Engineering Company." (Termination Letter, ECF No. 11-14, PageID.233; *see also* 06/26/2020 Email, ECF No. 11-13, PageID.217.)  AEC's termination letter stated:

> Your last date of attendance in the workplace was March 20, 2020, just prior to the COVID-19 shutdown. During the shutdown, you were laid off from April 1, 2020 to May 10, 2020. After the COVID-19 shutdown, Advance asked

you to return to work on Monday, May 11, 2020. We
agreed to delay your return to work to enable to attend to
a personal family matter.

Per your request, on June 8, 2020, we provided you with a
comprehensive list of the precautions and safety measures
Advance has taken to protect you and your colleagues
during the COVID-19 pandemic. Additionally, we
implemented reasonable accommodations for you to
discuss with your physician to address your concerns
about performing your job with your hearing disability.
We also requested that you provide an updated note from
your physician by June 22, 2020 to address any other
reasonable accommodations you required.

As of today's date, we have not received documentation
from your physician, nor have we received a date that you
intend to return to work. Therefore, as stated above, you
have voluntarily resigned from your employment with
Advance Engineering Company.

(Termination Letter, ECF No. 11-14, PageID.233.)

## C

On May 23, 2023, Daley filed this action against AEC. (*See* Compl., ECF No.

1.) Daley's remaining claims allege that AEC violated the PWDCRA by (1) "failing

to accommodate" his disability and (2) "terminat[ing] his employment because of

his disability." (Id. at ¶¶ 15-16, 19, PageID.3-4.)[1]  AEC has now filed a motion for

---

[1] Daley also brought a claim for age discrimination under the Elliott-Larsen Civil
Rights Act, Mich. Comp. Laws 37.2101, *et seq.* (*See* Compl., ECF No. 1.)  "Upon
review of the discovery in this matter," Daley has agreed that this claim "lacks
factual support," and he therefore has voluntarily "withdraw[n] said claim." (Resp.,
ECF No. 13, PageID.283.)

summary judgment. (*See* Mot. for Summ. J., ECF No. 11.)  The Court concludes that it may resolve the motion without oral argument. *See* Local Rule 7.1(f)(2).

## II

AEC seeks summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Under that rule, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

## III

### A

The Court first addresses Daley's failure-to-accommodate claim.  "To prove a *prima facie* case under the PWDCRA for a failure to accommodate claim, the plaintiff must show that '(1) [he] is disabled within the meaning of the [PWDCRA]; (2) [he] is otherwise qualified for the position, with or without reasonable

accommodation; (3) [his] employer knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Picard v. Costco Wholesale Corp.*, No. 20-cv-10005, 2022 WL 4122081, at *5 (E.D. Mich. Sept. 9, 2022) (quoting *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011)). *See also Aldini v. Kroger Co. of Michigan*, 628 F. App'x 347, 350 (6th Cir. 2015) (identifying the same *prima facie* requirements). AEC argues that Daley's claim fails because he has failed to satisfy the fourth and fifth elements of his *prima facie* case. The Court agrees.

## B

In order to satisfy the fourth element of his *prima facie* case, Daley was required to show that he "propos[ed] an accommodation" and "that *that* accommodation [was] objectively reasonable." *Steward v. New Chrysler*, 415 F. App'x 632, 642 (6th Cir. 2011) (emphasis in original) (quoting *Johnson v. Cleveland City Sch. Dist.*, 344 F. App'x 104, 111 (6th Cir. 2009)). "As part of this initial burden," Daley had to establish "that the proposed accommodation [was] reasonable in the sense both of efficacious and of proportional to costs." *Id.* (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996)). He also had to show "'that [he] requested the specific accommodation; [he] may not rely on accommodations that [he] did not request.'" *Id.* (quoting *Manigan v. Sw. Ohio Reg'l*

*Transit Auth.*, 385 F. App'x 472, 478 n.5 (6th Cir. 2010).  Daley has not carried his burden of demonstrating that he requested a reasonable accommodation.  Indeed, he provides only a single paragraph of analysis supporting his failure-to-accommodate claim, and that paragraph – which cites no legal authority beyond the elements of his *prima facie* case – falls far short of showing that he sought a reasonable accommodation.

As an initial matter, it is not clear that Daley actually requested any accommodations that, if provided, would have led him to return to work.  While he identified certain possible changes to his position and duties in his correspondence with AEC, he admitted that he did not say to AEC "if you do this, then I'll come back to work." (Daley Dep. at 105:6-17, ECF No. 11-2, PageID.182.)  Moreover, he did not provide a note from his physician identifying any reasonable accommodations to his position even though AEC had requested such a note.

But even if the Court were to accept Daley's contention that he requested accommodations, his claim would still fail because the modifications to his position that he claims to have requested were not reasonable.  Daley first contends that he requested the reasonable accommodation of working from home.  However, that requested accommodation was not reasonable because it would have eliminated essential functions from Daley's position. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (explaining that a "reasonable accommodation" "does *not*

include removing an 'essential function' from the position, for that is *per se* unreasonable" (emphasis in original) (quoting *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998))).  "Essential functions generally are those that the employers' 'judgment' and 'written job description' prior to litigation deem essential." *Id.* at 761–62 (cleaned up).  Here, Daley's job description made clear that many of the essential functions of his position had to be performed in person. Indeed, the description specified that he would "primarily" be working "in the production and warehouse areas of the plant." (*See* Job Description – CMM Operator, ECF No. 11-4, PageID.189.)  And the description identified functions that could not readily have been performed anywhere other than in AEC facilities, including "[i]nspecting initial production parts," performing "analysis on variable data instruments," "[o]perat[ing]" the CMM and other machines/equipment, and instructing team members on "gage use." (*Id.*, PageID.188.)  Moreover, Daley points to no evidence in the record that he could have performed all of the essential functions of his job while working from home, nor has he cited a single case in which any court has determined that an employee in a position like Daley could reasonably perform the essential functions of his position from home.   Under these circumstances, Daley has failed to show that his proposed accommodation of working from home was reasonable.

19

Daley next contends that he requested the reasonable accommodation of working only "in his own office." (Resp., ECF No. 13, PageID.281-282.) This, too, was not a reasonable accommodation because it would have eliminated essential functions from Daley's position. As discussed above, Daley's position and duties required him to spend at least some time on the plant floor. (*See* Job Description – CMM Operator, ECF No. 11-4, PageID.188.) In fact, Daley acknowledged that "some of [his work] would have to be done at the floor[.]" (Daley Dep. at 61:19-23, ECF No. 11-2, PageID.139.) And he cites no evidence in the record showing that he could have performed all of the essential functions of his job while working exclusively in a private office. For these reasons, Daley has failed to show that his request to work only in a private office was reasonable.[2]

Finally, Daley contends that he proposed working fewer hours. However, there is no evidence that this proposed accommodation was related to his disability. Instead, he sought to work fewer hours "to allow for [him] to sleep enough" (*see* 06/11/2020 Email, ECF No. 11-13, PageID.219) and to make and eat meals, given that he lived 1-to-2 hours away from AEC. (*See* 06/03/2020 Email, ECF No. 11-13, PageID.228.) In other words, this request appeared to be tailored to addressing his

---

[2] While AEC did not provide Daley with a private office, it did propose to allow him to perform his duties in an isolated area of the facility and to interact with one masked and socially distanced person. (*See* Daley Dep. at 97:8-99:10, ECF No. 11-2, PageID.174-176; 06/08/2020 Email, ECF No. 11-13, PageID.221.)

20

commuting distance rather than accommodating his disability at work. Furthermore, working fewer hours was not a reasonable accommodation because, as Entsminger informed Daley, working 40 hours per week in the plant was an "essential function of [his] job[.]" (06/17/2020 Email, ECF No. 11-13, PageID.218.)  Daley has not identified any evidence in the record showing that he could have completed the essential functions of his position while working the reduced schedule he proposed.

For all of these reasons, the Court concludes that Daley has failed to show that he requested a reasonable accommodation.  Daley therefore cannot satisfy the fourth element of his *prima facie* case.

## C

In order to satisfy the fifth element of his *prima facie* case, Daley was required to show that AEC failed to provide a reasonable accommodation.  He has failed to make that showing.  AEC offered numerous accommodations that, collectively, would reasonably have allowed Daley to return to work.  Entsminger outlined the accommodations in her email to Daley dated June 8, 2020. (*See* 06/08/2020 Email, ECF No. 11-13, PageID.220-222.)  Those accommodations were:

- AEC employees would only communicate with Daley via writing or email.

- AEC employees would be notified not to approach or communicate with Daley in person.

- AEC would put tape around Daley's work area to remind others not to come in contact with him.

- As a backup, if in-person communication was necessary, one specifically identified person would be Daley's in-person contact.

- Daley's sole point of contact would be required to wear AEC-provided clear face masks or a face shield to enable Daley to lip-read.

- Daley would never be on the plant floor near any other employees.

- Gages that Daley needed to see would be sanitized – in front of Daley – before he came into contact with them.

(*See id.*, PageID.221.)  These accommodations fairly and appropriately addressed Daley's concerns about communication difficulties and COVID-19 exposure while simultaneously balancing AEC's need to have its sole CMM Operator working in-person.   While these accommodations were not the precise ones that Daley requested, they were sufficient under the ADA because "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996).

Daley's one-paragraph failure-to-accommodate analysis does not identify any evidence showing that AEC's proposed accommodations were insufficient or unreasonable.  Instead, Daley asserts, without citing any evidence in the record, that AEC's accommodations amounted to no accommodation at all. (*See* Resp., ECF No.

13, PageID.282.) Daley's unsupported assertion is insufficient to satisfy his burden on the fifth element of his *prima facie* case.

For all of these reasons, Daley has failed to establish the fifth element of his failure-to-accommodate claim.

## D

Because Daley has failed to establish two essential elements of his *prima facie* case on his failure-to-accommodate claim, AEC is entitled to summary judgment on the claim.

## IV

The Court next addresses Daley's claim that AEC discriminated against him in violation of the PWDCRA. The PWDCRA provides that an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability . . . that is unrelated to the individual's ability to perform the duties of a particular job or position." Mich. Comp. Laws § 37.1202(1)(b). Daley contends that AEC discriminated against him when it "terminated his employment because of his disability." (Compl., ECF No. 1, PageID.3.) The Court concludes that this claim fails as a matter of law.

"A claim of disability discrimination under the . . . PWDCRA may be proven by either direct evidence or circumstantial evidence." *Nieman v. Gen. Motors Corp.*,

No. 07-cv-12629, 2008 WL 4940585, at *4 (E.D. Mich. Nov. 17, 2008).   "In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *In Re Rodriguez,* 487 F.3d 1001, 1007 (6th Cir.2007) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).   "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* (quoting *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003)).   One example of direct evidence is "an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).   Daley has not identified any direct evidence that AEC terminated his employment because of his disability.

Nor has Daley made a circumstantial showing that AEC did so.   When evaluating circumstantial evidence of discrimination in the context of a motion for summary judgment, courts apply the *McDonnell Douglas* burden-shifting framework.[3] *See Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019) (applying the *McDonnell Douglas* framework to plaintiff's PWDCRA claims); *Bachman v. Swann Harbour Ass'n*, 653 N.W.2d 415, 436 n.26

---

[3] *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

(Mich. App. 2002) ("The burden-shifting analysis under *McDonnell Douglas* . . . applies to PWDCRA claims").  Under this framework, (1) a plaintiff must establish "a *prima facie* case" of discrimination, (2) "[i]f the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate business reason for discharge," and (3) "[i]f the defendant provides such a reason, the burden shifts back to the plaintiff to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge." *Aho v. Dep't of Corrs.*, 688 N.W.2d 104, 109 (Mich. App. 2004) (citations omitted).

Daley's claim fails at the *prima facie* stage.  "To establish a *prima facie* case of disability discrimination under the PWDCRA, the plaintiff must prove that: (1) [he] is disabled as defined under the PWDCRA; (2) that [his] disability is unrelated to [his] ability to perform [his] job duties; and (3) that [he] was discriminated against in a manner prohibited by the PWDCRA, i.e. that [he] was discharged because of [his] disability." *Nieman,* 2008 WL 4940585, at *4.  Daley offers only a single paragraph of analysis in support of his discrimination claim, and that paragraph does not identify any evidence to establish the third prong of his *prima facie* case – that AEC fired him because of his disability.

And the evidence in the record precludes a finding that AEC did so.  First, AEC twice hired Daley and employed him for a total of approximately 6-to-7 years despite his disability.  Moreover, during Daley's previous employment, AEC

accommodated his disability by granting his request for "equipment to help [him] talk and communicate on the telephone." (Daley Dep. at 47:21-48:13, ECF No. 11-2, PageID.124-125.)  All of that suggests that AEC desired to employ Daley despite his disability.  Second (and far more importantly), during the relevant time period in this case, AEC repeatedly asked and directed Daley *to return to work*, and AEC offered to make numerous accommodations to make his return possible.  AEC's efforts to secure Daley's *return* to work notwithstanding his disability conclusively show that AEC did not fire him because he was disabled.  AEC is therefore entitled to summary judgment on Daley's discrimination claim.

V

For all of the reasons explained above, AEC's motion for summary judgment (ECF No. 11) is **GRANTED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  January 23, 2025

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 23, 2025, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126